SEMELSBERGER ET UX. *v.* HATEM, RECEIVER FOR THE NATIONAL GUILD INSURANCE COMPANY

[No. 50, September Term, 1972.]

*Decided November 14, 1972.*

The cause was argued before MURPHY, C. J., and BARNES, MCWILLIAMS, SINGLEY and LEVINE, JJ.

*Barry H. Helfand* for appellant and cross appellee.

*John J. Sweeney, Jr.,* for appellee and cross appellant.

MCWILLIAMS, J., delivered the opinion of the Court.

Conformable to the provisions of Maryland Rule 826 g, the parties prepared and signed and the chancellor, Pugh, C. J., approved the statement which (as edited) follows:

> The Claimants Hugh H. Semelsberger and Patricia Semelsberger, and Thomas J. Hatem, Receiver of The National Guild Insurance Company agree to the following Statement of Case

pursuant to Rule 826 g of the Maryland Rules of Procedure:

1. Thomas J. Hatem, Insurance Commissioner of the State of Maryland, is Receiver of The National Guild Insurance Company which was placed in Receivership on December 5, 1966. Hugh H. Semelsberger, Jr. and Patricia Semelsberger, his wife, filed claims in the Receivership for damages relating to personal injuries suffered by Semelsberger in an accident on May 29, 1965 in Washington, D. C. In that accident Semelsberger was struck by a motor vehicle owned by National Guild's insured Germaine J. Matrozzo. Semelsberger was a police officer at the time of the accident, and was diverting traffic from the scene of a collision which involved two other motor vehicles. Claimants filed timely claims with the Receiver, and the Receiver had duly filed exceptions and recommendations to the Court concerning the claims.

2. Semelsberger and his wife subsequently filed suit in the United States District Court for the District of Columbia in 1967 for damages naming as Defendants Germaine J. Matrozzo, her husband James J. Matrozzo, and the operators and owners of the other two vehicles involved in the accident which commanded Semelsberger's attention at the time he was struck by Matrozzo. The Receiver declined to defend the Matrozzos in the U. S. District Court proceedings by leave of this Honorable Court; and they were represented therein by their own counsel.

3. The case came to trial in the District of Columbia, and after four days it was terminated as follows on November 6, 1970:

By Release executed November 6, 1970 Semelsberger released the other four Defendants, in consideration of the total sum of $15,000.00,

paid in the following manner: $11,000 was paid in cash by Government Employees Insurance Company (GEICO), the insurance carrier of the Defendants Cosgroves; the sum of $1,000.00 was paid in cash by the Defendants Vines and the Buffalo Cab Association; Semelsberger accepted a Promissory Note from the Matrozzos in the amount of $2,500.00, payable in consecutive monthly installments of $75.00 each.

4. The Matrozzos also executed an Agreement with Government Employees Insurance Company where the Matrozzos agreed to repay GEICO in the event they defaulted on their Note and GEICO was compelled to pay the balance due thereon to Semelsberger, pursuant to its agreement with him. Matrozzo testified in Court that he did in fact make nine payments on the Note to Semelsberger, in the total amount of $675.00.

5. No specific Release was executed and given by the Semelsbergers to the Matrozzos upon dismissal of the District Court case, but the Semelsbergers filed two Orders, one dismissing the action as to the Matrozzos without prejudice, and the other dismissing the action as to the remaining Defendants with prejudice. The District Court action thereafter could not be revived by the Semelsbergers against any Defendant, because of the Statute of Limitations.

6. A hearing was held before the Honorable James H. Pugh on October 18, 1971 relating to the Semelsbergers' claims. At the hearing the parties agreed:

a) That the insured's husband, James J. Matrozzo, was negligent in the operation of her motor vehicle, and that his negligence was a proximate cause of Semelsberger's personal injuries.

b) That the National Guild automobile lia-

bility insurance policy issued to Germaine J. Matrozzo would have provided coverage up to the sum of $15,000.00 for personal injuries for each person. The premiums due on the insurance policy had been paid.

c) That the damages suffered by Semelsberger were valued in excess of $15,000.00 and therefore any award made to him and to his wife relating to her derivative claim would equal the policy limit of $15,000.00.

d) The parties stipulated the following Exhibits which were introduced at the trial:

i) Joint Exhibit No. 1—Certified Copy of Docket Entries from the U. S. District Court for the District of Columbia, Civil Action No. 349-67, Hugh H. Semelsberger, Jr. and Wife v. Germaine J. Matrozzo, et al.

ii) Joint Exhibit No. 2—Promissory Note dated November 6, 1970 from James John Matrozzo and Germaine J. Matrozzo, his wife, to Hugh H. Semelsberger, Jr. in the amount of $2,500.00.

iii) Joint Exhibit No. 3—Agreement between James John Matrozzo and Wife and Government Employees Insurance Company.

iv) Joint Exhibit No. 4—Release executed by Hugh H. Semelsberger, Jr. dated November 6, 1970, releasing Daniel Cosgrove, Thomas J. Cosgrove, Joe Frank Vines, Jr. and the Buffalo Cab Association.

v) Receiver's Exhibit No. 1—Original application for insurance executed by Mrs. Matrozzo on October 2, 1964.

vi) Claimants' Exhibit No. 1—Copy of Standard Auto Insurance Policy issued by The National Guild Insurance Company.

7. At the hearing on October 18, Mrs. Ma-

trozzo testified in part, concerning the application for auto insurance, as follows:

a) Direct examination by Mr. Sweeney:

"Q. And at the time, did your husband James drive that vehicle to any degree? A. Only back and forth to work. That is all.

Q. Did he work every day? A. Yes, every day except Sundays.

Q. How many miles did he drive to work, do you recall approximately? A. Well, when we lived in Rockville, to Wheaton, from there.

Q. Did he have a driver's license? A. As far as I know, he didn't.

Q. You never saw it? A. I never saw it, no.

Q. Mrs. Matrozzo, let me direct your attention; also, another question on that application. This is paragraph 8 and it says, 'List all persons who drive the described automobiles', and you list your name do you not, your name Matrozzo, and on the right it says percentage, and you find there the figure 100%.

Now, at the time, based on the testimony you just gave, Mrs. Matrozzo, at the time you signed that document, you did not, in fact, drive a car 100%, did you? A. That is right."

b) Direct examination by Mr. Sweeney:

"Q. Why did you sign that note, Mrs. Matrozzo? A. I thought when we signed this that we were; I thought when we signed this, this was the end of all our, the settlement with Semelsberger.

Q. You thought it was the end of the case with Mr. Semelsberger? A. Yes.

Q. Mrs. Matrozzo, on the application

which we have identified earlier, question 7A reads, 'Has any driver had automobile insurance declined or cancelled', and it is checked off yes. A. Yes.

Q. Now, to what does that refer; which insurance was declined or cancelled? A. We had insurance with State Farm when I first got my driver's license, and only had three, about three months, and I thought the reason they cancelled it, I didn't get no explanation about why.

Q. Was your husband himself named as an insured on that policy? A. Yes. He was.

Q. And was that the reason you did not put his name in when you applied for National Guild insurance, because of the prior cancellation? A. I believe so.

Q. Thank you, Mrs. Matrozzo."

c) Cross-examination by Mr. Helfand:

"Q. At the time you filled out this application, which is Defendant's Exhibit No. 5, isn't it true that at that time, the time you filled it out, you intended to be the only driver? A. That is right."

d) Re-direct examination by Mr. Sweeney:

"Q. Mrs. Matrozzo, do you remember testifying a few moments ago that when you took out this insurance your husband was driving the car to and from work? A. Yes.

Q. And you intended that he continue to drive to and from work, did you not? A. Not all the time.

Q. But occasionally? A. Occasionally.

Q. And that was your intention when you took out the insurance? A. Occasionally, yes.

Q. The fact of the matter is he did just that, didn't he? A. Off and on.

Q. Wasn't he driving it every day?

Wasn't he driving it 75 or 80% of the time at the time of the accident? A. Yes.

Q. Mrs. Matrozzo, just one last question or two about the question that counsel just asked you on cross examination, about notice from the insurance company about rescission, or cancellation; actually you were notified shortly after the accident, after you gave your statement, that the policy was going to be rescinded, or cancelled or voided, were you not? A. They sent me a statement in the mail, like I said, just said, it was going to be cancelled, and that is all.

Q. They had previously taken your statement, had they not, and asked you about the application and your husband's vision and absence of a driving license? A. I don't remember if they took that before or after."

8. Wilbur Friedson testified for the Receiver that he was the former Executive Vice-President and General Manager of The National Guild Insurance Company. He stated that he had been associated with the company for about ten years prior to the Receivership, and among other things was in charge of the underwriting department. He testified that under the Company's practice and policy, it would not have insured someone who had vision in only one eye, because "it just increased the hazard tremendously." He stated that National Guild would not have written this coverage for a man with such impaired vision even for an additional premium, regardless of whether or not the individual had a valid driver's license. Mr. Friedson further testified that National Guild would not have issued a policy to Mrs. Matrozzo had it known that one of the operators of the vehicle had no driver's license. (Mr. Matrozzo testified that he had never had a driver's license.)

9. Both Matrozzos testified that by signing the Promissory Note for $2,500.00 they thought that would have ended the case that was being tried in U. S. District Court.

10. Mrs. Matrozzo also testified that after the accident National Guild took a statement from her concerning her insurance application, and sent her a notice of rescission.

11. The chancellor refused to allow any cross-examination of Mr. Matrozzo concerning his conversations with attorneys for GEICO and the Buffalo Cab Association relating to his contribution of $2,500.00 toward the disposition of the Semelsbergers' law suit.

12. There is no testimony or evidence relating to Mrs. Matrozzo's knowledge of her husband's visual impairment.

13. At the hearing before the chancellor on October 18, 1971, the Receiver opposed the allowance of either Claim, on the following bases:

a) Material misrepresentation by Mrs. Matrozzo in her application for insurance, justifying the rescission by National Guild as of the date of issuance of the policy.

b) That Claimants had released joint tortfeasors Cosgroves, et al., and their claims against Matrozzo were therefore reduced by the amount of consideration paid claimants by the joint tortfeasors ($12,500.00).

c) That the Semelsbergers had released the Matrozzos by accepting a Promissory Note and dismissing Case No. 439-67 in the United States District Court for the District of Columbia; said claims thereafter being barred by the Statute of Limitations.

14. The chancellor thereupon issued his Opinion and Order of October 28, 1971, dismissing the Claim of Patricia Semelsberger and placing a value of $2,500.00 on the Claim of Hugh H.

Semelsberger, Jr. Both Claimants and the Receiver have appealed.

The chancellor's opinion and order (as edited) follows:

In these two claims for personal injuries (Semelsberger $1,000,000; his wife $300,000), the Receiver excepts thereto on the following grounds:

"(1) That said claim is unliquidated as to the Receiver under Article 48A, Section 160 of the Maryland Code (1964 Replacement Volume, as amended).

"(2) Said claim is grossly over-stated and is not conclusive as to the Receiver.

"(3) That said claim is not supported by satisfactory documentary evidence, as is required by Article 48A, Section 149 of the said Annotated Code.

"(4) That the policy against which claim is made did not cover the accident involved because of misrepresentation in the application for insurance by the named insured."

It appears from the docket entries of a case entitled Hugh E. Semelsberger Jr. and Patricia Semelsberger v. James John Matrozzo and Germaine J. Matrozzo, CA 439-67 United States District Court for the District of Columbia, that said civil case was dismissed without prejudice and without costs. These docket entries also disclose that Patricia Semelsberger dismissed her case also. Agreements and releases were introduced in evidence in these cases which disclose that the Matrozzos entered into a settlement of the civil action in said District Court by the execution of a promissory note in the amount of $2,500.00, thereby settling the case of Semelsberger against them. Since the Civil Action aforesaid was dismissed by Patricia Semels-

berger the court denies the same. As to Semelsberger's claim, the court finds that the sum of $2,500.00 is a liquidated sum and was agreed to be paid by the Matrozzos, and therefore it is of the opinion that said claim be allowed, said claim being for a liquidated sum in accordance with Section 160 of Article 48A of the Maryland Code (1964 Replacement Volume as amended). The court further finds from the evidence in this case that this claim is not overstated and is supported by satisfactory proof and that the insurance policy did cover the same.

It is, thereupon,

ORDERED, that Semelsberger's claim be allowed in the amount of $2,500.00.

Since Patricia Semelsberger has "abandoned" her appeal we shall be concerned only with the appeal of her husband and the cross appeal of the receiver whose principal contention, both here and below, is that Mrs. Matrozzo's misrepresentation in the application for insurance was material and that the insurer was justified in rescinding the contract and denying coverage. We think the chancellor fell into error when he concluded "that the insurance policy did cover the same."

It is clear from Mrs. Matrozzo's testimony that her husband "was driving the car to and from work" when she "took out this insurance." And she "intended that he continue to drive to and from work" but only "occasionally." As it turned out "occasionally" was "75 or 80% of the time." She knew he did not have an operator's license; indeed, he said he had never had one. Although he had but one eye, she represented to the insurer that no driver had a physical or mental impairment. The undisputed, uncontroverted testimony of Friedson that the insurer "would not have written this coverage for a man with such impaired vision *even for an additional premium,* regardless of whether or not the individual had a valid driver's license," and his testimony, also undisputed and uncontroverted, that it "would

not have issued a policy to Mrs. Matrozzo had it known that one of the operators of the vehicle had no driver's license" seems to us to establish, without much question, the materiality of her misrepresentation. (Emphasis added.) It is true, of course, that the chancellor, although his opinion is silent in this regard, must be considered to have found as a fact that the admitted misrepresentation was not material. In our judgment his finding, assuming he so found, was clearly erroneous and in reaching this conclusion we are acutely cognizant of the fact that the case comes to us on a statement in lieu of pleadings and evidence formally agreed to by both parties and approved by the learned chancellor himself. Rule 886. It would seem to follow, therefore, that the credibility of the witnesses is not a factor here.

In his exhaustive opinion in *State Farm Mutual Automobile Insurance Co. v. West,* 149 F. Supp. 289, 305 (D.C. Md. 1957), Judge Watkins, applying the law of Maryland, said:

"The court has no difficulty in holding that the answers in the applications were representations made by West to the plaintiff. A material misrepresentation made by an applicant for insurance, in reliance on which a policy is issued to him, renders the policy voidable as against the applicant and all who stand in no better position, whether such misrepresentation be made intentionally or through mistake and in good faith (Silverstein v. Massachusetts Mutual Life Insurance Co., 1947, 189 Md. 182, 55 A. 2d 334; Baker v. Continental Casualty Co., 1953, 201 Md. 464, 474, 94 A. 2d 454; Hancock Mutual Life Insurance Co. of Boston, Massachusetts v. Adams, 1954, 205 Md. 213, 221, 107 A. 2d 111; A.L.I. Restatement, Contracts, sec. 476). Where evidence of bad faith or falsity or materiality is uncontradicted or clear and convincing, the court may so rule as a matter of law."

Our more recent decisions, *e.g., Stumpf v. State Farm Automobile Ins. Co.,* 252 Md. 696, 705 *et seq.,* 251 A. 2d 362 (1969), and *National Mutual Ins. Co. v. McBriety,* 246 Md. 738, 744-46, 230 A. 2d 81 (1967), leave no doubt that Judge Watkins's reliance on the Maryland cases he cited in his opinion was not misplaced.

Since what we have said is dispositive of both the appeal and the cross appeal, it will not be necessary to deal with the other interesting questions presented in the briefs. The order of 28 October 1971 allowing the claim of Semelsberger in the amount of $2,500 will be reversed.

> *Order of 28 October 1971 reversed.*
>
> *Costs to be paid by the appellant and cross appellee.*